# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WILFRED MORRISON ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | JURY TRIAL DEMANDED |
| MERILL LYNCH, PIERCE, FENNER ) | |
| & SMITH, INCORPORATED, ) | |
| ) | 08C 1150 |
| Defendant. ) | |

RECEIVED
FEB 25 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## COMPLAINT

Plaintiff Wilfred Morrison files this Complaint against Defendant, Merrill Lynch, Pierce, Fenner & Smith, Inc., ("Merrill Lynch" or "the Firm") and states as follows:

### JURISDICTION

1.  Jurisdiction is based on 28 U.S.C. §§1331 and 1343, and principles of pendent and supplemental jurisdiction.

### PARTIES

2.  Plaintiff is a Financial Advisor at Merrill Lynch, where he has been employed since 1998.

3.  Defendant Merrill Lynch is a publicly-traded, Fortune 100 corporation that does business across the United States and globally. Merrill Lynch is a full service securities firm engaged in the retail and institutional sale of securities, options contracts and various other financial products. Merrill Lynch employs more than 15,000 Financial Advisors ("FAs" or "brokers") who serve the Firm's clients at offices located throughout the United States, including many offices in this District. In 2006, Merrill Lynch had a net worth of over $30 billion and achieved net earnings that exceeded $7 billion.

## BACKGROUND

4. Plaintiff has been employed by Merrill Lynch since 1998 in the Firm's Allentown, Pennsylvania and Milwaukee, Wisconsin offices. Despite his strong performance and dedicated service, Plaintiff has been subjected to race discrimination and retaliation throughout his employment with Merrill Lynch. Merrill Lynch has treated and continues to treat Plaintiff worse than employees who are not African-American, including by denying him the opportunity to advance to branch management.

5. Plaintiff is a class member in the putative nationwide class action, *McReynolds et al. v. Merrill Lynch*, Case No. 05-cv-06583, pending in the Northern District of Illinois. *See* Ex. A, *McReynolds v. Merrill Lynch* Second Amended Complaint. The race discrimination suffered by Plaintiff is consistent with and part of the nationwide, systemic discrimination against African-Americans alleged in *McReynolds v. Merrill Lynch*.

6. As set forth in the Charge of Discrimination Plaintiff filed with the Equal Employment Opportunity Commission ("EEOC"), Plaintiff is relying on the *McReynolds v. Merrill Lynch* lawsuit to vindicate his rights and incorporates the allegations therein into this Complaint.[1]

7. Plaintiff has filed this lawsuit in an abundance of caution to protect his legal rights and claims to the extent they fall outside the scope of the allegations and claims pled in the *McReynolds* lawsuit, which are tolled by that lawsuit. Plaintiff does not wish to burden the Court

---

[1] In his EEOC charge, Plaintiff stated the following: "The race discrimination suffered by Complainant is consistent with and part of Merrill Lynch's nationwide, systemic discrimination against African-Americans. Complainant is a class member in the putative nationwide class action, *McReynolds et al. v. Merrill Lynch*, Case No. 05-cv-06583, pending in United States District Court in the Northern District of Illinois ("*McReynolds v. Merrill Lynch*"). Complainant is relying on that lawsuit and incorporates the allegations therein into this Charge of Discrimination as though stated herein. *See* Ex. A, Second Amended Complaint, *McReynolds v. Merrill Lynch*. All claims set forth in this Charge relate back to that lawsuit and the representative charges of discrimination affiliated with that lawsuit. *See, e.g.*, Ex. B., Maroc Howard Charge of Discrimination."

or waste judicial resources so will therefore request that this case be consolidated with the *McReynolds v. Merrill Lynch* lawsuit as related and stayed until the *McReynolds* court decides the class issues in that case.

8. As described more fully in the *McReynolds v. Merrill Lynch* Complaint, Merrill Lynch has and is engaged in a pattern and practice of race discrimination and retaliation against its African-American employees and employs company-wide practices and policies that have a disparate impact on African-Americans. *See generally* Ex. A. Merrill Lynch fails to provide African-Americans with equal opportunities to earn income and advance to management. The Firm maintains stereotypical and biased views about African-American employees and clients that form the basis of personnel decisions and create an environment where occupational segregation, disparate treatment and harassment are pervasive and condoned. Merrill Lynch's human resources department is ineffective at resolving complaints of race discrimination and retaliation, and, as a result, many African-Americans recognize the futility of lodging internal complaints. Those who do come forward are retaliated against. Merrill Lynch's pattern and practice of race discrimination is ongoing, as demonstrated in part by the dramatic, historic and continued underrepresentation of African-American brokers and managers.

## FACTUAL ALLEGATIONS

9. Consistent with Merrill Lynch's systemic discrimination against African-Americans, Plaintiff has been subjected to race discrimination and retaliation throughout his career. Merrill Lynch has failed to provide Plaintiff with the same opportunities to succeed and for promotion as employees who are not African-American. Plaintiff has not received the same level of resources, mentoring, managerial support, sales support, and business opportunities as his non-African-American counterparts. Plaintiff has also been harmed by Merrill Lynch's

3

discriminatory management selection practices and denied promotion to the lucrative branch management position. Plaintiff has been subjected to a hostile work environment in which African-Americans are treated as inferior. When Plaintiff raised his treatment and that of other African-Americans with management and Human Resources, he was retaliated against for voicing these issues. As a result of Defendant's systemic discrimination, Plaintiff has received lower wages and commissions than similarly situated non-African-Americans and has been shut out of advancement opportunities. Merrill Lynch's unlawful conduct constitutes a continuing violation and includes, but is not limited to, the events described herein.

Unlawful Treatment as Financial Advisor

10. Plaintiff was hired as a Financial Advisor in the Allentown, Pennsylvania office. Armed with a master's degree in economics and years of experience as a broker at a boutique investment firm, Plaintiff was well-prepared to succeed. Indeed, Plaintiff was able to bring nearly all of his accounts with him when he joined Merrill Lynch. Plaintiff was also active, well known and well respected in the Allentown community, where he served as an elected councilman, school board liaison, chairman of the planning commission, and board member of a local revitalization organization.

11. When Plaintiff arrived at the Allentown Merrill Lynch office, he encountered a highly segregated workforce. Plaintiff began his career as the only African-American FA in his office of over twenty FAs, and even when the office nearly doubled in size, Plaintiff remained the only tenured African-American FA in the office. Nor did Merrill Lynch appear to make any real effort to hire African-American FAs. Upon information and belief, only two African-American trainee brokers, or "POAs," were hired during Plaintiff's tenure. Due to Defendant's systemic discrimination, both were soon driven out of the Firm. On information and belief,

when Plaintiff joined the Milwaukee office in 2005, he was the first African-American to ever work in that office, which has existed since approximately 1900.

12. Plaintiff, like other African-Americans at Merrill Lynch, has been denied the same income-generating opportunities as brokers who are not African-American, as alleged in the *McReynolds et al. v. Merrill Lynch* lawsuit. Throughout Plaintiff's employment, Merrill Lynch has maintained a discriminatory system of assigning important business opportunities, including accounts, referrals, leads, walk-ins, call-ins, and initial public offerings ("IPOs"). Plaintiff does not recall receiving leads, walk-ins, call-ins, referrals, or IPOs in his career at Merrill Lynch, though he understood that he qualified for IPO distributions. Plaintiff rarely received accounts from departing brokers. On the few occasions that accounts were directed to Plaintiff, they were typically small or problematic accounts. One of the only quality accounts Plaintiff ever received demonstrates Merrill Lynch's race-based decision making and racial steering: the clients in the household account were African-American.

13. Consistent with Merrill Lynch's systemic discrimination, Plaintiff has been disadvantaged by Merrill Lynch's policies and practices regarding partnerships, or "teams" of brokers. Plaintiff has been excluded from favorable teams while FAs who were not African-American were able to join teams that resulted in the receipt of substantial assets and books of business. Management approved or directed the formation of these teams. Plaintiff has not been asked, encouraged or approached to join a team, and his attempts to form favorable partnerships or gain access to teams were rejected.

14. On more than one occasion, Plaintiff informed Merrill Lynch management and Human Resources ("HR") of the discriminatory operation of teams. The Firm's HR representative acknowledged inequality in the formation and operation of teams. Nevertheless,

Merrill Lynch took no action to change the policies it knew to be discriminatory or to include African-Americans in teams. Worse still, Plaintiff was retaliated against for raising these important issues to management and HR.

15. Plaintiff has not received the same managerial, administrative and sales support as his non-African-American colleagues to develop and service his book of retail brokerage business. As a consequence of Defendant's discriminatory practices, Plaintiff's production, quintile ranking, and compensation have been considerably lower than they would have been had he received the same opportunities as his counterparts who were not African-American.

Hostile Work Environment and Retaliation

16. Throughout his career at Merrill Lynch, Plaintiff, like other African-Americans, has been subjected to a hostile work environment where African-Americans are treated as inferior, in a racially stereotypical fashion, and subjected to abusive and harassing treatment, comments and behavior. In addition to the differential treatment and retaliation described herein, Plaintiff has been treated as an unwelcome outsider throughout his employment. Plaintiff has been excluded from networking opportunities that might have led to business opportunities. Merrill Lynch managers have been hostile to Plaintiff and have made no genuine attempt to mentor or otherwise assist him, or to regularly include him in meetings, social outings or networking opportunities.

17. Plaintiff's managers and co-workers have also made clear his outsider status through actions and words, including race-based comments. For example, a colleague in the Allentown office asked Plaintiff, "how's my nigger?" A manager told him he needed to talk to an African-American POA about his hair, and that he "wished he had more whites like" Plaintiff, or words to that effect.

6

18. Although Merrill Lynch publicly touts its ever-changing diversity initiatives, these programs are ineffective and mere public relations "lip-service." Internally, Merrill Lynch management is derisive about and openly flouts the Firm's diversity initiatives. During meetings, managers complained that they were not permitted to hire white men any more, unless they were gay or disabled, or words to that effect. Despite these comments, African-Americans appeared to seldom be hired. When Plaintiff made suggestions about how to hire diverse candidates, he was told by management "that is not one of our priorities," or words to that effect.

19. Negative stereotypes about African-Americans, and other ethnicities, pervade the Merrill Lynch culture. Indeed, and at times under the mantra of so-called diversity, Merrill Lynch racially profiles its clients and steers clients, jobs and opportunities in a race-based fashion.

20. Another aspect of Merrill Lynch's systemic discrimination, culture and hostile environment is the retaliation that results when employees raise issues involving discrimination and exclusion. Plaintiff's treatment is illustrative of this culture and the inadequacy of the Firm's HR department. On a number of occasions, Plaintiff has raised concerns about race discrimination to HR and to management. In spite of Plaintiff's best efforts, the Firm's treatment of him and other African-Americans has not improved. The discrimination against Plaintiff has continued and he has been targeted for retaliation and attempts to intimidate him into silence.

Discriminatory Management Practices and Treatment

21. Branch managers[2] preside over more than 500 Merrill Lynch offices nationwide. Pursuant to Firm-wide policies, Merrill Lynch vests its branch managers with the responsibility

---

[2] Over the years, the title of the branch manager, or sometimes complex manager, has changed. The current title is Director, but for sake of simplicity, Plaintiff uses "branch manager" throughout.

7

to hire Financial Advisors and other personnel, to distribute important resources and business opportunities, and to provide managerial support and supervision to FAs. The Firm's managers also implement and ensure compliance with Merrill Lynch's company-wide policies and practices and generally set the tone for office conduct.

22. Merrill Lynch employs management grooming, assessment and selection practices and policies that discriminate against and have a disparate impact on African-Americans. Management candidates are selected largely by a "tap-on-the-shoulder" process that systemically excludes African-Americans. As Merrill Lynch is aware, its management eligibility criteria have a disparate impact on African-Americans. The Firm's practices and policies regarding management assessment and selection are steeped with stereotypes and otherwise disadvantage African-Americans. The Firm's exclusion of African-Americans from management serves to perpetuate and reinforce its racially-biased culture. Plaintiff's unsuccessful attempts to pursue a career in branch management at Merrill Lynch illustrate the discriminatory impact of Merrill Lynch's policies and practices.

23. Beginning at least in 1999, Plaintiff repeatedly expressed his interest in branch management, asking his manager and HR about the path to branch management and available management or "feeder" positions. Plaintiff's many inquiries were discouraged or ignored. Plaintiff was dissuaded from pursuing a career in management and told that no positions were available. Moreover, on information and belief, at the same time Plaintiff's management inquiries were put off, similarly-situated white FAs in the Allentown office were placed in management positions.

24. Despite the lack of support or encouragement by Merrill Lynch, Plaintiff did not give up his aspirations to join management. In 2004, Plaintiff forwarded postings he discovered

of available management positions to his manager and to HR and again asked about management positions. His manager again attempted to dissuade Plaintiff and even told him that the Punta Gorda, Florida office, with older brokers and clients, would be like "babysitting."

25. Although it appeared that many management positions were available, Plaintiff was told that the only open position was a Resident Director ("RD") position in Milwaukee, Wisconsin, which Plaintiff pursued. An RD position is a lower-level "management" position that can be a stepping-stone to a branch management position. The RD position does not require formal management assessment or result in the same compensation or prestige as a branch manager position. As an RD, Plaintiff was to manage a small office but still maintain a book of retail brokerage business.

26. Prior to joining the Milwaukee office, Plaintiff was given only a cursory interview, during which his potential manager showed no interest in Plaintiff or his questions about the office. Indeed, despite his requests, Plaintiff was provided with virtually no information about the office he was to manage. The Milwaukee office Plaintiff joined in 2005 turned out to be riddled with problems. The office was not following many Firm policies, and there were a number of outstanding client complaints against FAs in the office. Plaintiff did not receive the management, administrative or other support afforded to RDs who were not African-American.

27. Plaintiff also suffered retaliation after he brought to his manager's attention what appeared to be discriminatory compensation disparities in the office. Plaintiff's manager told him to "counsel out," or terminate, a lower-paid Hispanic woman. When Plaintiff explained his belief that, given the disparate rates of pay, this action would put the Firm at risk, Plaintiff's manager told him not to worry because "we have people in HR who can handle that," or words

to that effect.

28. Despite the obvious problems at his Milwaukee office, Plaintiff received no support or guidance from his management team prior to or during his tenure. To the contrary, on account of his race and in retaliation for his complaints regarding discrimination, Plaintiff's managers only served to undermine his work and credibility. Plaintiff believes that his managers disparaged and attempted to solicit complaints about Plaintiff from personnel in his office.

29. After Plaintiff had been in the office for six months or less, his manager suggested he step down as RD. Prior to that time, Plaintiff had not been told of any performance problems. Indeed, Plaintiff believed he had made demonstrable progress in the office, including by reducing the office's expenses.

30. As a result of the Firm's discrimination and retaliation, Plaintiff was removed from his management position in approximately April 2007, when the Caucasian RD of the Pewaukee, Wisconsin office was promoted to Managing Director of the entire Wisconsin complex and made the Director of Plaintiff's Milwaukee office. Merrill Lynch did not offer Plaintiff the open RD position in Pewaukee or any other commensurate positions.

31. Despite the campaign to remove Plaintiff from his RD position, in the summer of 2006, the Regional Manager in Chicago had placed Plaintiff on the "diversity list" of candidates to attend the May 2007 Management Assessment Center ("MAC").[3] Plaintiff was not sponsored by his own manager, who also did not help him prepare for MAC or otherwise groom him for branch management. Indeed, Plaintiff received no meaningful training or help from the Firm to prepare for MAC. Plaintiff was assigned a mentor, who never met with him, then assigned

---

[3] MAC is a facility in which annual or bi-annual assessments are made of management candidates. Candidates must be sponsored to attend, and then are usually groomed and prepared before the assessment process. MAC takes place over a three-day period, and candidates are required to complete a series of exercises and mock-scenarios to test their management aptitude.

10

another mentor who met with him only very briefly.

32. Consistent with the Firm's systemic discrimination, the management assessment process is performed predominantly by non-African-Americans and is replete with racial stereotypes. As a result of racial bias, the skills of African-Americans are overlooked and undervalued. African-Americans are typically shut out of the real training and preparation process, which tends to be informal and occurs behind closed doors. Like the few other African-Americans who attended MAC, Plaintiff was treated differently and worse than his white counterparts, in part due to exercises riddled with embarrassing and offensive stereotypes that the candidates were expected to carry out. As a result of race discrimination, the Firm did not "pass" Plaintiff from MAC.

33. After the May 2007 MAC, management continued to deny Plaintiff the support and encouragement for re-assessment that is offered to MAC attendees who are not African-American. Plaintiff expressed a desire to be re-assessed and was told that he would be put on a plan to prepare him for reassessment, but he received no such plan. Being ousted from an official management role further reduced Plaintiff's chances of passing a re-assessment, should one occur. The end result is that Plaintiff effectively has been shut out of branch management.

<u>Plaintiff Was Harmed As A Result of Defendant's Unlawful Treatment</u>

34. As a result of Merrill Lynch's unlawful conduct, Plaintiff has suffered substantial damages, including lost wages and other benefits. Plaintiff has also suffered embarrassment and humiliation, and his career and reputation have been irreparably damaged as a result of Defendant's unlawful conduct. Plaintiff has suffered loss of enjoyment of life, inconvenience and other pecuniary and non-pecuniary losses as a direct result of the Firm's conduct, as well as incurring attorneys' fees and costs.

35. Punitive damages are appropriate due to Defendant's intentional conduct and continued reckless indifference to the federally protected rights of Plaintiff and other African-Americans.

## COUNT I

**RACIAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. 2000e et seq.**

36. Plaintiff realleges and incorporates as though stated in Count I each preceding paragraph of this Complaint.

37. Plaintiff filed a representative charge of racial discrimination with the Equal Employment Opportunity Commission ("EEOC"), and received Notice of Right to Sue.

38. Title VII of the Civil Rights of 1964, 42 U.S.C. 2000e et seq. and amendments thereto ("Title VII") make it an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms or conditions, or privileges of employment, because of such individual's race, color or national origin; or to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, or national origin.

39. It is unlawful for an employer to engage in racially biased decision-making and treatment. It is also unlawful for an employer to make decisions infected by stereotypical thinking or other forms of less conscious bias. Employers are not lawfully allowed to engage in racially motivated conduct driven by business concerns, for example, concerns about the effect on employee relations, or the negative reaction of clients or customers. Thus, an employer violates the law when it acquiesces, accedes to or perpetuates perceived customer bias. Nor may

race or color ever be a bona fide occupational qualification under the law.

40. Through the conduct alleged in this Complaint, and the Second Amended Complaint in the *Mc Reynolds et al. v. Merrill Lynch* lawsuit, Merrill Lynch violated Title VII of the Civil Rights Act of 1964 and amendments thereto by subjecting Plaintiff and other African-Americans to differential treatment and by adopting policies and practices that had a disparate impact against African-Americans.

41. Merrill Lynch is strictly responsible for the acts and conduct of its managers and knew of should have known of a culture created by its managers and employees that discriminated against and was hostile to Plaintiff and to African-Americans.

## COUNT II

### RACIAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. SECTION 1981

42. Plaintiff realleges and incorporates by reference as though fully stated in Count II the preceding paragraphs of this Complaint.

43. Section 1977 of the Revised Statutes, 42 U.S.C. Section 1981 as amended guarantees all persons the same right to make and enforce contracts as non-African-Americans. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of contractual relationship.

44. Merrill Lynch subjected Plaintiff to racial discrimination in violation of 42 U.S.C. Section 1981.

## COUNT III

### NEGLIGENT HIRING AND SUPERVISION

45. Plaintiff realleges and incorporates by reference as though fully stated in Count III the

preceding paragraphs of this Complaint.

46. Through this Complaint, and the Second Amended Complaint in the *McReynolds et al. v. Merrill Lynch* lawsuit, Plaintiff alleges that Merrill Lynch breached the duty of care it owes its employees by negligently hiring and supervising managers who caused injury to Plaintiff.

## COUNT IV

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

47. Plaintiff realleges and incorporates by reference as though fully stated in Count IV the preceding paragraphs of this Complaint.

48. Through this Complaint and the Second Amended Complaint in the *McReynolds et al. v. Merrill Lynch* lawsuit, Plaintiff alleges that through its agents, Merrill Lynch intended to cause Plaintiff severe emotional distress, the conduct toward Plaintiff was extreme and outrageous, Merrill Lynch's conduct caused the injury, and Plaintiff suffered an extreme emotional response.

## COUNT V

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

49. Plaintiff realleges and incorporates by reference as though fully stated in Count V the preceding paragraphs of this Complaint.

50. Merrill Lynch had a duty of care to Plaintiff and breached that duty, Plaintiff suffered severe emotional distress, and Merrill Lynch's conduct, through its agents, was the cause-in-fact of Plaintiff's injury.

## COUNT VI

### BREACH OF EXPRESS CONTRACT

51. Plaintiff realleges and incorporates by reference as though fully stated in Count VI

the preceding paragraphs of this Complaint.

52. Merrill Lynch entered into certain written contracts with Plaintiff as an employee.

53. These contracts required Merrill Lynch, among other things, to provide Plaintiff with leads, referrals, account distributions, training, sales support, managerial support, mentoring, and other resources and business opportunities.

54. Merrill Lynch breached these contracts by engaging in the conduct described above and otherwise failing to perform its obligations, including but not limited to depriving Plaintiff of leads, referrals, account distributions, sales support, managerial support, mentoring and other resources.

55. These contracts also required Merrill Lynch to comply with the anti-discrimination laws, which Merrill Lynch failed to do with respect to Plaintiff and other African-Americans.

56. These breaches caused Plaintiff substantial damages as described herein.

## COUNT VII

### BREACH OF IMPLIED CONTRACT

57. Plaintiff realleges and incorporates by reference as though fully stated in Count VII the preceding paragraphs of this Complaint.

58. Merrill Lynch entered into certain implied contracts with Plaintiff.

59. These contracts arose out of written instruments, oral promises, employee handbooks, and patterns and practices of customary conduct, and included, *inter alia*, policies of nondiscrimination.

60. Certain agreements were based on, *inter alia*, clear promises that Plaintiff reasonably believed constituted offers, which were disseminated in a manner such that Plaintiff was aware of the contents of the offers.

61. After learning of the offers, Plaintiff began or continued to work for Merrill Lynch, thus accepting the offers and formal binding agreements.

62. The agreements obligated Merrill Lynch to give or make available to Plaintiff leads, referrals, account distributions, training, sales support, managerial support, mentoring, and other resources and business opportunities.

63. By engaging in the conduct described above and otherwise failing to perform its obligations, Merrill Lynch breached these agreements and deprived Plaintiff of the benefit of his bargain.

64. Merrill Lynch also breached these agreements by failing to honor its obligations in an equal fashion, favoring non African-American employees over African-American employees.

65. These breaches caused Plaintiff substantial damages as described herein.

## COUNT VIII

### DEFAMATION

66. Plaintiff realleges and incorporates by reference as though fully stated in Count XI the preceding paragraphs of this Complaint.

67. Through the conduct alleged in this Complaint, Merrill Lynch defamed Plaintiff and caused him harm.

### PRAYER FOR RELIEF

68. WHEREFORE, Plaintiffs and all others similarly situated respectfully request seek the following relief:

a. Declare that the acts and conduct of Merrill Lynch were unlawful and find in Plaintiff's favor and against Merrill Lynch as to Counts I - VII;

b. Award Plaintiff the value of all compensation and benefits lost as a result of

Merrill Lynch's unlawful conduct;

    c.    Award Plaintiff the value of all compensation and benefits he will lose in the future as a result of Merrill Lynch's unlawful conduct;

    d.    Award Plaintiff make-whole relief and statutory, compensatory and punitive damages;

    e.    Award Plaintiff prejudgment interest;

    f.    Award Plaintiff attorneys fees, costs and disbursements;

    g.    Award Plaintiff such other equitable, injunctive and legal relief as this Court deems just and proper to end Defendant's unlawful employment practices and fairly compensate Plaintiff.

    Respectfully submitted,

    STOWELL & FRIEDMAN, LTD.

    By: _____

Mary Stowell – Attorney No. 02750015
Linda D. Friedman – Attorney No. 06190092
Suzanne E. Bish
**STOWELL & FRIEDMAN, LTD.**
321 S. Plymouth Court
Suite 1400
Chicago, Illinois 60604
(312) 431-0888

350888